OPINION OF THE COURT
Stanley Parness, J.
This bifurcated proceeding reviews the tax assessments levied on tax lots 20, 24, 25, 46, 49 and 52, block 1514, New York County, for tax years 1985/1986 through 1990/1991 and the assessments on tax lot 21, block 1514, New York County, for tax years 1986/1987 through 1990/1991. The initial issue for a determination is the correct market values for the subject tax years.
The location, Lexington Avenue, East 85th and 86th Streets, is the hub of Yorkville, a preeminent East Side Manhattan commercial/residential neighborhood. The tax lots are improved with circa 1910 3-, 4-, and 5-story residential walk-ups and a 3-story, circa 1910 class 0-5 professional/office building. The improvements on lots 24 and 25 are solely residential in use, the remaining improvements have a mixed use with stores on the street level, commercial tenants on the first floor with the upper floors for the most part vacant residential space.
On October 23, 1984, petitioner purchased lots 20, 24, 25, 46, 49 and 52 for $16,750,000. The presale 1984/1985 total tax assessment on the six properties was $3,470,000. The following tax year the actual assessments were increased 187% to $9,812,000.
On September 24, 1985, petitioner added tax lot 21 to the six property assemblage. This lot, on the corner of Lexington Avenue and 85th Street, is separated from the assemblage by tax lot 22 on 85th Street and by tax lots 119 and 120 on Lexington Avenue. Petitioner paid $2,000,000 or approximately 15 times tax lot 21’s gross income stream. Its 4-story improvement was built in 1910. The third and fourth floors contain 21 (mostly vacant) single room occupancy (SRO) rooms. On the street level, there is a fruit and vegetable stand and shoe repair shop. The first floor is occupied by a tax preparer and insurance sales office. The assessment on lot 21 was raised 134% from $385,000 to $900,000.
Both grantee/petitioner and the grantor are knowledgeable realtors. Respondent contends that the 1984 sale is represen *106 tative of land value in the area and therefore may serve as a market indicator upon which to assess. In this court, respondent made no effort to demonstrate that the assessments levied on these properties were market indicated on an income basis, choosing rather to rely on the subject sales and other development sales.
The law is clear that assessment value must reflect the existing use of the property. Thus, potential development of the property to a higher and better use may not serve as the basis for assessing. (Matter of Addis Co. v Srogi, 79 AD2d 856; Matter of Adirondack Mountain Reserve v Board of Assessors, 99 AD2d 600; Matter of Pepsi Cola Co. v Tax Commn., 19 AD2d 56; Matter of General Elec. Co. v Macejka, 117 AD2d 896; Matter of Allied Stores v Finance Adm’r of City of N. Y., 76 AD2d 835.) "The issue is not what the highest and best use * * * is to the petitioner, but its highest value in the market place” (Matter of Great Atl. & Pac. Tea Co. v Kiernan, 79 AD2d 371, 373 [emphasis added]).
One would have thought that Matter of Pepsi Cola Co. (supra, at 58) had put the issue to rest, wherein it stated that "[t]he owner is to be assessed on the basis of the building * * * as it existed on the taxable status date, and not on what he could have erected” (emphasis added).
Respondent seeks to tax on the basis of a value that exists in "mind’s-eye” of someone who would eventually develop the property to a new and higher more profitable use. This position is at odds with the noted case law that requires that where the improvement is adequate for the site that real estate taxes be measured on the basis of the most probable selling price based upon the actual and potential cash flow from the existing improvement. (Matter of Pepsi Cola Co. v Tax Commn., supra, at 58.) A theoretical value or future value is personal to the assembler who is willing to accept immediate high risk for greater profit in the future. Today, seven years after the purchase of these properties, the use remains the same, but the tax assessment has almost tripled, most of it in the first year after its purchase. In the interim, market circumstances have changed significantly; the depressing effect on real estate of the 1986 change in the Federal tax law, and expiration of RPTL 421-a benefits; the "Black Friday”, October 1987 crash; the virtual disappearance of bank credit; and the economic downturn that followed resulting in today’s moribund real estate market. Yet, respondent continues to sustain the assessment based on a still nonexistent theoretical *107 use of the property which may not be feasible for many years, claiming that the purchase price paid by petitioner in attempting to assemble this site is evidence of market value. It is not. Rather, it is but the first entrepreneurial step toward future development.
As stated, respondent relies on the development sales in the immediate area and the subject sales as proof of the taxable value of the properties. But the relevancy of the subject sales to market value is the very issue in this proceeding. Respondent would be the first to reject a subject sale as a market indicator of tax value if unfavorable to its assessment. In People ex rel. Gale v Tax Commn. (17 AD2d 225), this same respondent rejected a subject sale and successfully argued tax value should reflect market value. In this proceeding the market values of these properties based on the existing use will not support their assessments.
The City of New York has frequently stated that it attempts to assess commercial property at 45% of full market value. Assessments at less than full value (100%) are fractional assessments. Even were the subject sales and respondent’s so-called comparable sales reflective of market value rather than an assemblage value, the practice of "assessing on sale” requires strenuous administrative effort by assessing authorities which assess fractionally. (See, Allegheny Pittsburgh Coal v Webster County, 488 US 336; Matter of Krugman v Board of Assessors, 141 AD2d 175.) From the evidence submitted it is clear the assessor’s value was directly pointed toward the sale price paid by petitioner for properties.
Essentially the taxes based upon respondent’s assessments are more in the nature of a recurring sales tax on investment capital, a tax generally recognized as regressive and, as the tax is applied here, invidious and counterproductive. It is the commercial tenants renting the existing improvements who in the end pay the tax charge that is passed along in the form of tax escalations!
An examination of a few of the tax lots in this block is insightful. Subject tax lots 21 and 24 and tax lot 22, the latter not owned by petitioner, make interesting comparisons. Lot 22, 149 East 85th Street, is a 5-story circa 1920 walk-up, almost twice the size of subject lot 24, which it adjoins. Lot 24 is a 4-story walk-up circa 1910 building. The land on lot 22 for the 1984/1985 tax year was assessed at $210,000, the building at $110,000, total $320,000. The contiguous corner, subject lot *108 21, with the SROs, fruit stand, shoe repair shop and tax preparer, was assessed at a total of $385,000, land $285,000 and building $100,000. Subject lot 24, the smaller residential building situated on land 52% of the square foot area of lot 22, was assessed at a total of $125,000, land $109,000, improvement $16,000.
Two years after the purchase of lots 21 and 24, the 1986/ 1987 assessments of lots 21, 22 and 24 as compared to the 1984/1985 assessments, are as follows:
LAND ASSESSMENT
1984/1985 1986/1987
Subject lot 21 $285,000 $750,000 163% increase
lot 22 210,000 210,000 - 0 -
Subject lot 24 109,000 300,000 143% increase
IMPROVEMENT ASSESSMENT
Subject lot 21 $100,000 $150,000 50% increase
lot 22 110,000 200,000 82% increase
Subject lot 24 16,000 62,000 288% increase
If the assessor was in fact seeking to determine intrinsic land values in the neigborhood and relying on the subject sales as well as other sales considered pertinent as a basis for arriving at this assessment value, we would expect to see a significant increase in the land assessments of all properties in the neighborhood.
If the subject lots on both sides of lot 22 suddenly become more valuable would not the land under lot 22 increase accordingly? Respondent might argue that lot 22 will not be developed so that no increase in its value is warranted. However, lot 22 separates lot 21 from lots 24 and 25. Without lot 22, lots 24 and 25’s utility in the proposed development is debatable.
Respondent, to support its focus on assemblage sales, has treated the subject tax lots as one tax entity. But the fact is they are seven distinct and separate lots. If sold separately, the lots would have commanded not an assemblage value, but a market value based on the economic income of each property, a value significantly lower than the $18,750,000 assemblage price paid for their acquisition.
Turning to lot 21, respondent’s appraisal projects a value *109 based upon a future building potential of 19,284 square feet. However, the existing improvement has a gross building area of only 5,594 square feet. The assessor and respondent’s appraisal witness have not valued what exists now but what may be built in the future. Yet lot 21 is but part of an assemblage which must yet be completed and cleared before this hypothetical improvement can be constructed.
The problem with adopting development purchase prices as evidence of market value is that when applied to the instant case it is difficult to determine to what extent, if any, the purchase price was enhanced by reason of the fact that acquisition could be had of the six parcels at one time.
Further in taxing what essentially is the development potential of the property, respondent seeks to tax not the market value of the tax lots but rather the premium over market value this petitioner was willing to pay in 1984 to obtain six contiguous lots at one time and then in 1985 another lot necessary for the assemblage.
Indeed, the problem of valuing properties as they are acquired for assemblage is brought more sharply into focus in the subsequent purchase of lot 21 in 1985.
The purchase price was $2,000,000 which on respondent’s square foot analysis comes to $103 per square foot as opposed to the $54 per square foot paid by petitioner for the other parcels.
Clearly, petitioner paid what he did for this parcel because of its need for the assemblage, thus the price does not reflect “market” but solely how much this petitioner who already had six lots was willing to pay to continue his assemblage.
Obviously the greatly enhanced square foot cost for this tax lot over that paid for the six others was due to its unique value to petitioner. Respondent’s appraiser, demonstrating the fallacy in his theory of valuation, dismisses the import of this sale by merely stating that petitioner, an admittedly shrewd speculator, overpaid for this parcel (while contending on the other hand that petitioner underpaid for the first six lots).
Of course, were we dealing with the purchase of a complete assemblage, vacant and ready for development, then there would be some validity to respondent’s valuation based upon development potential. (See, Matter of Weingarten v Town of Ossining, 85 AD2d 697.) But that is not the case here, for if it were, development would have taken place with the result that the effect of the increased taxes would have been miti *110 gated by tax exemptions (if available) and by the increased income to be derived from the new high-rise structures.
In view of the foregoing, the court rejects respondent’s valuation method and values derived thereby and determines that the proper method of valuing these tax lots is one based upon their existing use. The present improvements are capable, based on their actual and potential income, of supporting the existing use. Petitioner’s expert appraised each lot, relying on the actual or potential income generated by the existing improvements. Essentially he used the actual income or where there were vacancies ascribed market income to the improvements.
The problem of valuing these tax lots has been made difficult by respondents’ failure to submit an alternate appraisal based on income reflecting the actual use of the lots. Land has no value until there is a use for it. Respondent has taxed on the basis of a future use of land whereas petitioner’s value is based on the actual use of improved land. The purpose of appraisals of property for tax purposes is to enable the equitable distribution of the cost of delivering municipal services, police, fire, sanitation, education and the like. It is surely unfair to place on petitioner a greater share of the tax burden merely because of his ability to orchestrate this assemblage. The amount of use of municipal services by petitioner and tenants is the same after the transfer of title as before. When the use changes, the value of the property will change.
Because of respondents’ election to defend its tax levy solely on a faulty premise, this record contains no range in evidence. (Matter of City of New York [A. & W. Realty Corp.], 1 NY2d 428.) The only probative evidence in this record as to market value is petitioner’s value for each lot for each tax year.
If anything, respondent’s appraisal may overstate the market value of the property: the first observation must be that a potential buyer of any of the tax lots would be aware that the assessments have radically increased. For example, tax lot 20’s assessment increased 400% from $365,000 to $1,826,000. The actual tax expense for this property commencing July 1, 1985, increased $28,399 from $33,015 to $61,414. A knowledgeable prospective buyer would be aware that a $28,399 increase portended further transitional increases for four more years (which actually occurred) resulting in a 1989/1990 tax expense of $174,086 and a further tax expense of $181,342 in 1990/ 1991. At page 32 of petitioner’s value witness’ report, he states *111 "the income capitalization approach is predicated on the assumption there is a definite relationship between the amount of cash flow a property may generate and its value.” This is true. At page 39 of the report, he sets forth the net operating income before taxes of lot 20; at page 47, the net operating income before taxes of lot 24; at pages 55, 63, 71 and 79, the net operating incomes before taxes of lots 25, 46, 49 and 52 respectively.
Net operating income before financing and after taxes is the income stream that signifies to a purchaser and to a seller the value of commercial property. The appraiser’s task is to measure the income stream and place a value on it. In doing so, the appraiser will consider the degree of risk attached to the income stream, and the probability of an increase in net income over expenses, and also the general market atmosphere. In this case, as to the possibility of a rent increase in excess of expenses, the assessment expense promised to keep would-be tenants busy paying tax escalations, leaving little reason in a down market for the property owner to expect any real increase in net cash flow.
Taking lot 21 as an example, between 1985/1986 and 1990/ 1991, the net operating income before taxes appears to increase from $73,800 to $190,500. This change in income does not result in an increase in cash flow but merely reflects collection of taxes from tenants. After the taxes collected have been paid and deducted, the net income will be the true cash flow. Ordinarily, cash flow will be used to finance any mortgage and the net after income taxes will be the return on equity. In this case, the increase in return is nil. The real estate tax expense for lot 21 increased 449% from $33,015 in 1984/1985 to $181,341 in 1990/1991. The net operating income, i.e., the cash flow, of lot 21 declined over this period of time 26% from $12,384 in 1985/1986 to $9,159 in 1990/1991. It should be understood that during all this time, petitioner has received no return on equity. In a sense, the assessment levied here raised the actual cost of the purchase price, something neither petitioner nor any purchaser would contract for. In sum, the total tax expense on the seven tax lots since purchased by petitioner has increased from $315,000 per tax year, to $1,148,000 per tax year. This proceeding reviews only six years through 1990/1991. There is little doubt that the expense will be duplicated in future years. If this type of assessment is permitted, who will risk venture capital on an assemblage, unless there is complete financing in place, tenant *112 removal assured, building permits in hand, and the site ready for demolition.
Finally, as a last example, there is tax lot 25, a purely residential building located on 85th Street. Without further acquisitions its use in the assemblage is tenuous at best. Landlords find it next to impossible to pass on real estate tax increases to controlled residential tenants and when they do, then only within the limits of permissible increases. In 1984/ 1985, the actual and transitional assessment on lot 25 was $125,000. By 1990/1991, the actual assessment had increased 260% to $450,000; the transitional 215% to $393,000. Over the years under review, sans tax expense, operating expenses averaged $32,533 per year. The expenses increased a very conservative 3% annually from $30,800 to $36,400 per year. Over the same period, the tax expense averaged $28,000. Something is wrong when real estate taxes average 48% of the gross income; and 46% of the total expenses including real estate taxes. Further impacting on the present value of this property is the problem of clearing residential tenants and the time and money it will take to do so.
The court, having found that the income capitalization method employed by petitioner in arriving at his value for each lot to be the proper method by which the market value of these properties based upon their existing structures and uses may be obtained; and in the absence of any contrary evidence in the record, accepts the income, expenses, and resulting net cash flow inclusive of real estate taxes used by petitioner’s appraiser and adopts his basic capitalization rates and the resulting values he found for each tax lot through this methodology.